# COURT OF GENERAL SESSIONS — NEW YORK COUNTY.

## February, 1920.

## THE PEOPLE v. GHEDALE GOLDENBERG.

### (110 Misc. 548.)

INDICTMENTS—WHEN MOTION TO DISMISS GRANTED—STOCKBROKERS—GRAND LARCENY, SECOND DEGREE.

Where an indictment for grand larceny in the second degree charges that defendants, who are stockbrokers, having in their possession as the agents, bailees and trustees of a named person, one of their customers, the sum of $475, feloniously appropriated said money to their own use with intent to deprive their customer of the use and benefit thereof, and it appears that the charge is based upon the alleged appropriation by defendants of part of the profits accruing to the customer on his speculation in stocks, a motion to dismiss the indictment will be granted.

MOTION to dismiss indictment.

*Edward Swann, District Attorney (John J. Dooling, Assistant District Attorney, of counsel), for People.*

*Kopp & Perlman, for defendants.*

MULQUEEN, J.:

On the 20th day of August, 1919, the grand jury filed an indictment charging the defendants, Charles W. Galvin and Irwin Bloom, with the crime of grand larceny in the second degree.

There are two counts in the indictment. The first count is in the common-law form.

The second count charges that the defendants, as the agents, bailees and trustees of one Henry W. Hennig, having in their possession the sum of $475 of the personal property of the said

Henry W. Hennig, feloniously appropriated the said personal property to their own use, with intent to deprive the said Henry W. Hennig of the same and of the use and benefit thereof.

On motion of the defendants they were given a copy of the grand jury minutes, and they now move to dismiss the said indictment on the ground, among others, that the evidence before the grand jury does not sustain the indictment.

It appears from the minutes that the defendants were brokers in the county of New York; that the complainant, Hennig, on or about the 23d of June, 1919, mailed an order from Washington to purchase 200 shares of Uzold Tire stock at six and one-quarter; that he inclosed a check for $500 as margin. Hennig came to New York on the eighth day of July and saw the defendant Bloom, who told him that they had bought the stock for $5 a share from a broker named A. J. Peyton. Hennig did not talk with Galvin, but he said that Galvin was in the room part of the time during the conversation with Bloom. He said that Bloom told him that he had been obliged to pay $50 in cash to some agent in connection with the transaction. Bloom also told him that they would not carry the stock for more than thirty days, during which time complainant could sell the stock, or they would deliver certificates to him on payment of a balance of $565.

On July twenty-fourth he saw Mr. Bloom, who said to him: "Hennig, when you come back bring the balance of $565 and buy this stock outright, because it is going up." He did not take up the stock.

Hennig went to Washington and returned on the twenty-ninth of July. The defendant Bloom called him up on the telephone and advised to "get out of Uzold stock as it is slated for a drop; it is going down." He went to the office of Galvin & Co. and gave Bloom an order to sell the stock, which he had theretofore purchased on margin. Bloom told him, "I don't believe I can get more than 6½ for the stock." Galvin subsequently came into the office and said that Bloom had told him

to tell Hennig that the best price he could get was six and five-eighths.

He then gave an order to buy fifty shares of Overland stock. Subsequently he received a statement reporting the sale of Uzold Tire stock and the purchase of the Overland stock.

Galvin & Co. settled with him on the basis of a purchase of 200 shares of Uzold Tire stock for $1,065 and the sale of the same stock at six and five-eighths per share. They delivered to the complainant a check for $203.75 and a certificate for 50 shares of Overland stock.

Subsequently Hennig came to the conclusion that his stock had been sold for a higher price than six and five-eighths. He went to the office of the district attorney to make a complaint: there a demand in pursuance of section 957 of the Penal Law was prepared for him and he served it on Bloom, who said he would give him the statement within twenty-four hours, and the next day gave him such a written statement.

Albert J. Peyton, a witness before the grand jury, testified that he was a broker and promoter, and, as such, was promoting Uzold Tire stock; that he had a deal with a Mr. H. S. L'Hommedieu, who represented himself as a broker, saying that he had a customer in Washington who wanted 200 shares of the stock at the underwriting price, with a reduction for brokers. Peyton agreed to sell him the stock, provided it was for a customer and not for a broker.

The agreement was that L'Hommedieu was to pay five and one-half for the stock, and that he was to get in before the opening of the market on July twenty-second. He called on Mr. Peyton a day or two after, and Peyton said to him: " I am sorry, but you did not take advantage of the underwriting price and come in." L'Hommedieu said: " I am in a pretty fix; I have accepted this man's money on your word." Peyton finally said to L'Hommedieu: " I will stretch a line in this case, as long as you have this customer's money, and I will deliver the stock, but you must have the check to-day before 3

o'clock or you do not get the stock." L'Hommedieu came back in about half an hour and requested Peyton to deliver the stock to Galvin & Co. On July twenty-eighth the stock was finally delivered to Galvin & Co. for $1,000.

Peyton further testified that he had charge of the market for this stock on July twenty-eighth, and that he had heard of no sale at six and five-eighths; that the stock opened higher than nine that day and closed at nine and one-eighth.

Two other members of the Curb Association were called and testified that they were specializing in Uzold Tire stock on July twenty-ninth, and that as far as they knew the stock opened at ten and closed at nine and one-eighth, and they knew of no sale lower than nine.

It thus appears that the charge of larceny is based on the alleged appropriation of part of the profits accruing to Hennig on his speculation. The defendants are charged with stealing $475, the difference between the price of stock at nine and six and five-eighths, the price at which they claimed to have sold it.

There is no merit in this contention and the indictment must be dismissed. (People v. Paine, 35 Misc. Rep. 763; People v. Thomas, 83 App. Div. 226.)

In People v. Paine (supra), decided in 1901, the defendant, a broker, was arrested on a charge of larceny and held by a magistrate. The matter was brought before Judge McAdam on a writ, and he dismissed the complaint and discharged the defendant. The court said: " In the present instance, the $167 placed in the hands of the defendant by the complainant made him the debtor of the latter to that amount and gave the depositor the right to recover by civil action a return of the deposit or to call upon the defendant for an accounting."

The court also held that " the complainant fails to set forth any charge of which a criminal court has jurisdiction, and the attempt to make a criminal offense of the transaction looks like an effort to use the criminal courts as a means of enforcing an

obligation the remedies respecting which belong exclusively to the civil courts established for the purpose."

In People v. Thomas (supra), decided in 1903, the complainant was introduced to the defendant, who represented himself a broker doing business under the name of J. G. Stewart & Co. He said he was not a member of any exchange, and that he transacted business through the firm of William B. Smith & Co., reputable members of the Consolidated Exchange. The complainant said he wished to trade in stocks and grain, and gave him as margin two checks, one for $300 and the other for $250. The defendant told him to make the checks payable directly to Smith & Co., and they were delivered to that firm. Accordingly the complainant gave the defendant orders for the purchase and sale of stocks and wheat, and he received reports every day of the transactions. On April nineteenth the complainant estimated his profits at $500, and he ordered the defendant to close his account and to give a check for the amount of his margin and the accrued profits. Defendant notified Smith & Co., and they gave him a check to the order of Stewart & Co. for $685.32. Defendant indorsed the check and deposited it to his own account. It also appeared that the complainant was the sole and only customer that the defendant, Thomas, had. He failed to pay over any of the proceeds to the complainant. He was indicted and convicted of grand larceny.

The conviction was reversed by the Appellate Division. Justice Morgan J. O'Brien, writing for the court, cited with approval People v. Paine, and said: " Considering the nature of the transaction between the parties, we fail to discover any relation between them other than the ordinary one that exists between a broker and customer. Where, as here, money is deposited with a broker for margins which when deposited loses its identity as the money of the depositor and which it is proper for the broker to place in his general account in a bank or with another broker to be used the same as he uses his other money employed in his business, the right of the depositor to the

specific money is lost and he cannot claim that the broker has received such money in a fiduciary capacity.

" We think that it would be going further than any adjudicated case and further than any construction extending the scope and purpose of section 528 of the Penal Code should go, to conclude that the facts proven would justify a conviction for larceny. Were it otherwise then in every case where a customer deposits money with a broker to be used by him generally in his business, the failure of such broker to return the deposit, together with what might have been realized in the shape of profits upon the speculation, would leave him open to the charge of having embezzled his customer's money. We do not think it was the intention of the Legislature, nor is it the reading of the provisions of the Penal Code, that any such radical departure should be made so as to change a transaction that has always been regarded as establishing the relation of debtor and creditor into one which would place the broker in the position of a trustee who receives money in a fiduciary capacity which he is obliged at all times to keep separate and apart from his own moneys and on demand return upon pain of indictment and conviction for embezzlement."

" We think, however, that the prosecution failed to establish any agreement or arrangement under which the defendant was to deposit the money in a special account as the money of Von Zeibel. On the contrary, we think the evidence shows that the deposit with Stewart & Co. was just the same, no other or different than if it had been *actually made with the defendant as a broker*. We fail to find, therefore, that the property mentioned in the indictment was received in a fiduciary capacity or under directions which made it the subject of embezzlement. The transaction, assuming the evidence of the prosecution to be true, was that the complainant was to deal with the defendant's firm as his brokers, and whether the defendant mingled the funds of Von Zeibel with those of other customers, or, having no other customers, had merely this money deposited to his

credit with Smith & Co., it does appear that it was in his general as distinguished from a special account, and thus the elements which would be essential to preserve the ownership of Von Zeibel in the special fund or money are wanting.

" This, we think, becomes clearer if we eliminate Smith & Co. and assume that the money was actually deposited with the defendant and by the defendant placed in his general account in a bank. Or assume that the defendant received from Von Zeibel, instead of checks, cash and placed it within his money drawer, and while there it was stolen, would it have been the money of Von Zeibel or would it have been money for the loss of which the defendant would have to respond? Or suppose that he had taken the money to his bank and had obtained a certificate of deposit for the amount in his own name, and while holding it the bank failed, would not the defendant and not Von Zeibel be the loser, assuming that both were financially responsible?"

Justices VAN BRUNT, INGRAHAM, PATTERSON and Mc-LAUGHLIN concurred. Surely the unanimous opinion of such a bench has settled this question for all time. The law has not been changed, for section 528 of the Penal Code was reenacted in 1909 as section 1290 of the Penal Law.

The decision in People v. Meadows (199 N. Y. 1), is not in conflict.

In that case the defendant Meadows was engaged in business as broker in Buffalo, N. Y. He expected orders on the New York Stock Exchange through a firm of brokers in New York. Complainant gave him an order in Buffalo to purchase outright 700 shares of United States Steel Preferred. He reported to his customer that he had purchased the stock, and gave the customer a bill for the whole cost, including commissions. The customer gave his check for the full amount, with instructions to have the certificate for the stock delivered to him without delay. Defendant did not pay for the stock, but devoted the money to his own use. He never delivered the

stock to his customer. He was convicted of larceny, and the Court of Appeals sustained the conviction on the ground that this was a special account, that it was not the ordinary transac- tion between a broker and a customer; that the defendant had no right to use complainant's money as his own, and that under such circumstances the defendant had become a trustee within the meaning of the statute.

In other words, the distinction pointed out in People· v. Thomas between a special and general account was reaffirmed.

In the case of Hennequin v. Clews (77 N. Y. 427), the same reasoning was applied to stocks or bonds deposited as margin with a broker. But the wrongful use of such collateral was made a felony in 1913 by section 956 of the Penal Law, and the giving of a statement or memorandum which is false in any material respect, as alleged in the case before us, is a mis- demeanor. (Penal Law, § 957.)

Indictment dismissed.